**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| KRISTINA LEE STRUBLE BRUSH, | § | |
| and VERNON BRUSH, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-5016 |
| | § | |
| | § | |
| WELLS FARGO BANK, N.A., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This case arises out of a dispute between Kristina Lee Struble Brush and Wells Fargo Bank, N.A. over a mortgage loan that Mrs. Brush's father, Ronald James Struble, used to purchase a home. Mrs. Brush and her husband, Vernon Brush, moved into the home to help care for Struble, who was ill. Shortly before his death, Struble fell behind on his loan payments. The Brushes allege that, when Struble died, they informed Wells Fargo, the mortgage holder, and provided documents showing that Mrs. Brush had inherited the home. The Brushes allege that Wells Fargo agreed to modify the mortgage loan but then attempted to foreclose, breaching the agreement. In their amended complaint, the Brushes asserted claims against Wells Fargo for: (1) breach of contract; (2) detrimental reliance; (3) negligence; (4) breach of the duty of good faith and fair dealing; (5) violations of the Texas Debt Collection Act (TDCA); (6) violations of the Texas Deceptive Trade Practices Act (TDPA); (7) violations of the federal Fair Debt Collection Practices Act (FDCPA); and (8) declaratory and injunctive relief. (Docket No. 22).

Wells Fargo moved for summary judgment on all claims. (Docket No. 23). This court previously granted partial summary judgment against the Brushes on their negligence and breach

of duty of good faith and fair dealing claims.  (Docket No. 42).  Wells Fargo seeks leave to file a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), (Docket Entry Nos. 54, 65), and has filed such motions, (Docket Entry Nos. 55, 64).  In its Rule 12(c) motions, Wells Fargo argues that the Brushes have failed to state a breach of contract because the Brushes lacked authority to modify Stuble's loan and did not sufficiently allege that Wells Fargo received consideration for the purported loan modification agreements.  Wells Fargo also moves for judgment on the pleadings as to the Brushes' detrimental reliance claim because they have not sufficiently alleged that Wells Fargo made a valid promise or that they relied on any promise to their detriment.

Based on the pleadings; the motions, responses, and replies; the record; the arguments of counsel; and the relevant law, this court orders as follows:

Wells Fargo's motion for summary judgment, (Docket Entry No. 23), is:

- granted as to the Brushes' contract claims under the October 2009 HAMP Letter and Mr. Brush's claim under the August 2010 Agreement and denied as to Mrs. Brush's claim under the August 2010 Agreement;

- granted as to the Brushes' promissory estoppel claims;

- granted as to the Brushes' claims under the TDCA §§ 392.301(a)(7), 392.304 & (a)(8) and denied as to the Brushes' claims under the TDCA § 392.301(a)(8);

- granted as to the Brushes' claims under the DTPA; and

- granted as to the Brushes' claims under the FDCPA.

Wells Fargo's motion for leave to file a motion for judgment on the pleadings, (Docket Entry No. 65), is granted.  Wells Fargo's motion for judgment on the pleadings under Rule 12(c), (Docket Entry No. 64), is moot to the extent that Wells Fargo repeats arguments disposed of on

summary judgment and otherwise denied.  Wells Fargo's motion for leave to file a motion for judgment on the pleadings, (Docket Entry No. 54), is moot.  Wells Fargo's motion for judgment on the pleadings under Rule 12(c), (Docket Entry No. 55), is moot.

The reasons for these rulings are explained below.

## I.    Background

On August 7, 2007, Ronald Struble took out a $199,500 loan from Profolio Home Mortgage Corporation (PMHC) to purchase a home at 14818 Inverrary Drive in Houston, Texas. Struble executed a promissory note ("Note") payable to PMHC and a mortgage deed of trust pledging the Property as collateral.  (Docket Entry Nos. 22, ¶¶ 7–8; 37-2, Exs. 1, 2).  By early 2008, Wells Fargo became the owner and servicer of the Note.  (Docket No. 37-2, Ex. 3).  Well Fargo currently holds and services the Note.  (Docket Entry No. 39-1, Ex. A, ¶¶ 4, 6–8).

In July 2008, after Struble became ill, the Brushes moved into the home to help care for him.  (Docket Entry No. 36-2, ¶ 2).  Well Fargo sent Struble letters dated February 18 and March 3, 2008 stating that he had defaulted on his loan and warning that, unless certain steps were taken, Well Fargo could exercise its option to accelerate the loan and foreclose.  (*Id*. at Ex. 3). Well Fargo sent an August 25, 2008 letter to Struble offering to accept a partial reinstatement of the loan.  (*Id*. at Ex. 5).  Struble returned a signed Partial Reinstatement Agreement to Wells Fargo on September 5, 2008.  (*Id*.).

On February 20, 2009, Struble died intestate leaving Mrs. Brush as his sole heir.  (Docket Entry Nos. 36-1, ¶¶ 3–4; 37-2, Ex. 6 ).  On July 14, 2009, the Brushes faxed Wells Fargo a handwritten note stating that Struble had died and that the Brushes: had "sold our home to help out with the Inverrary house"; had "a lot of money tied into" the home; and were "working on

paying everything" while "[e]verything with Ron Struble is tied up in Court." The Brushes also provided Wells Fargo with their contact information. (Docket No. 37-2, Ex. 9).

Wells Fargo sent a July 23, 2009 letter addressed to the now-deceased Struble confirming its receipt of the Brushes' mortgage-payment-assistance request. (*Id.*, Ex. 10). As of August 12, 2009, Wells Fargo's records include an entry stating that Struble's mortgage was delinquent due to "MORTGAGER DECEASED." (*Id.*, Ex. 11 at 40). A credit report in Wells Fargo's records also states: "INQUIRY SSN RECORDED AS DECEASED." (*Id.*, Ex. 13).

Wells Fargo sent a letter dated August 13, 2009 addressed to Struble agreeing to accept a partial reinstatement of the defaulted loan. The letter confirmed "our conversation regarding the Forbearance arrangement and repayment of any past due amounts." (Docket No. 37-2, Ex. 14). On September 17, 2009, the Brushes faxed Wells Fargo another handwritten note again confirming Struble's death and asking for assistance in making the mortgage payments. (*Id.*, Ex. 15, 16). They also sent Struble's death certificate, (*Id.*, Ex. 17), a list of the Brushes' expenses, (*Id.*, Ex. 18), and Mr. Brush's pay check stubs, (*Id.*, Ex. 19).

Wells Fargo sent two documents, dated September 28, 2009, addressed to Struble. The first invited Struble to participate in the Home Affordable Modification Trial Period Plan (HAMP TPP). (*Id.*, Ex. 20). The second confirmed that Struble had entered the HAMP Trial Period. (*Id.*, Ex. 21). A HAMP TPP Letter dated October 26, 2009 names Struble as "Borrower" but was signed by the Brushes, each of whom added "Ronald J. Struble" next to their names. (*Id.*, Ex. 23). The Brushes claim that they were told by Wells Fargo representatives that because Mrs. Brush was Struble's sole heir, she was authorized to sign a TPP Agreement. (Docket Entry No. 36-2, ¶ 13). The TPP Agreement submitted in the summary judgment record does not include a Wells Fargo representative's signature. (Docket Entry No. 37-2, Ex. 23).

4

The Brushes also sent Wells Fargo a completed tax return transcript request that they signed in their own names, (*Id*. at 76); a note stating that Struble was deceased and that the Brushes had "payed [sic] our saving to [sic] 20,000 to the house to keep things going until we could get back on our feet," (*Id*. at 79); and a financial worksheet filled out in the Brushes' names, (*Id*. at 80).  On November 6, 2009, Wells Fargo requested and received IRS Tax Return Transcripts for the Brushes.  (*Id*., Ex. 24).  Beginning in November 2009, the Brushes made six $1,616.44 monthly payments to Wells Fargo as part of the HAMP TPP.  (Docket No. 37-4, Ex. 57).

On November 13, 2009, a probate judge approved the Small Estate Affidavit that Mrs. Brush filed on behalf of Struble.  (Docket Entry No. 37-2, Ex. 25).  The Affidavit states that Struble died intestate, Mrs. Brush was his only child, and that he owned the home subject to a Wells Fargo mortgage.  Mrs. Brush alleges that, on January 28, 2010, she sent Wells Fargo another copy of Struble's death certificate, along with the Affidavit and court order approving the Affidavit, via FedEx.  (Docket Entry Nos. 36-2, ¶ 23; 37-3, Ex. 27).

Mrs. Brush alleges that, in early April 2010, a Wells Fargo representative called the Brushes and told them that the HAMP TPP would be cancelled and that they would receive documents within a few days.  (Docket Entry No. 36-2, ¶ 27).  In an April 19, 2010 letter addressed to Struble, Wells Fargo stated that it determined that Struble's mortgage loan did not qualify for HAMP but that a different program might be available.  Enclosed with the letter was an unsigned proposed Loan Modification Agreement, with a May 1, 2010 effective date, between Struble and Wells Fargo.  (Docket Entry No. 37-2., Ex. 28).  On May 24, 2012, Wells Fargo ordered a title search for 14818 Inverrary.  The title report listed Struble as the owner but

also stated that a "Small Estate Affidavit dated 11/13/2009" had been recorded on November 25, 2009.  (*Id*., Ex. 29).

The Brushes received a second loan modification proposal notice dated July 19, 2010. This was also addressed to Struble.  A proposed Loan Modification Agreement (August 2010 Agreement), effective September 1, 2010, was enclosed.  (*Id*., Ex. 35).  On August 14, 2010, Mrs. Brush executed the Agreement, signing both her name and Struble's name.  (*Id*., Ex. 37). She alleges that she did this because the name printed below the signature line was Ronald J. Struble."  (Docket Entry No. 36-2, ¶ 29).  She explains: "I had already told Wells Fargo of my father's passing many times, and sent the proof of his passing and my right as the owner of the house, so I believed that this was just the way that the paperwork had to be done to make the loan modification agreement work out."  (*Id*.).  Mrs. Brush returned the Agreement, a $1,616.73 check made out to Wells Fargo dated August 14, 2010, a copy of Struble's death certificate, and the Small Estate Affidavit and court order approving the affidavit.  (Docket Entry Nos. 36-2, ¶ 30; 37-3, Exs. 36, 37, 38).  On August 17, 2010, the Loan Modification Agreement was executed by Halimo Y. Adem, Vice-President of Loan Documentation at Wells Fargo.  (Docket Entry No. 37-3, Ex. 39).

Mrs. Brush's first payment under the August 2010 Loan Modification Agreement, check # 1095, was returned unpaid. Mrs. Brush alleges that she does "not know why it was returned, because I believe that there were sufficient funds in my bank account at the time that I wrote the check and delivered it to Wells Fargo."  (Docket Entry No. 36-2, ¶ 30).  A statement from the Brushes' joint bank account shows that on August 18, 2010 the Brushes were charged a "Returned Item Fee For An Unpaid Check # 1095 IN The Amount of $1,616.72."  (Docket Entry No. 37-4, Ex. 58).  A copy of the check is marked NSF.  (Docket Entry No. 39-5, Ex. A-4).

The Brushes allege that soon after they sent Wells Fargo the executed August 2010 Loan Modification Agreement, a Wells Fargo representative told them by phone that Wells Fargo would not honor the August 2010 Agreement.  (Docket No. 36-2, ¶ 30-31).  A September 30, 2010 internal Wells Fargo document states:

> Decision hier: removing loan from loss mitigation.  3rd Party needs to be referred to the assumption dpt.  Mortgor is deceased and daughter signed deceased mortgor and her name.  This is not acceptable and require documentation stating she has authorization. ******* Mortgor needs to be referred to assumption dpt******** Rejected from settlement, 1 OB calls attempted[.]

(Docket Entry No. 37-3, Ex. 40).

Wells Fargo then began the foreclosure process.  According to Wells Fargo, the decision was based, at least in part, on the fact that the first payment under the August 2010 Loan Modification Agreement was returned for insufficient funds.  (Docket Entry No. 39-1, Ex. A, ¶ 12).  The record includes an October 12, 2010 Notice of Substitute Trustee Sale, signed by substitute trustee Rex Kesler, stating that the Property was scheduled to be sold at public auction on November 2, 2010.  (Docket Entry No. 37-3, Ex. 41).  The Brushes state that they did not receive any notice from Wells Fargo.  They learned of the impending foreclosure sale through an October 18, 2010 solicitation letter from McConnell Schott, LLP, a law firm offering to represent the Brushes.  (Docket Entry Nos. 36-2, ¶ 32; 37-3, Ex. 42).

When the Brushes received the letter, they immediately called Wells Fargo and were directed to the Assumption Department.  A Wells Fargo representative informed them that they should return a signed Non-Qualifying Assumption Application.  (Docket Entry No. 36-2, ¶ 33). That same day, the Brushes received an assumption application by fax.  (*Id.*, ¶ 34).  The application stated that the Brushes are applying for a "Non-qualifying (NQ) Assumption," which

did not require Wells Fargo to "review any financial creditworthiness of the remaining party or parties." (Docket Entry No. 37-4, Exs. 43, 44).

On October 20, 2010, the Brushes used FedEx to send Wells Fargo the completed and signed assumption application and supporting paperwork. The Brushes also faxed Wells Fargo multiple copies of Struble's death certificate and the Small Estate Affidavit and court order approving the Affidavit. (Docket Entry Nos. 36-2, ¶ 36–41; 37-4, Exs. 45–53). The Brushes included a handwritten note stating: "I had all this done correctly before, but something happened with the program yall had us in and have been helping with a new one. I was making all the new payments on time. I did not miss a payment since I started handling it." (Docket Entry No. 37-4., Ex. 46 at 22).

On October 26, 2010, Wells Fargo sent a letter to the "Estate of Ronald J. Struble" in response "to the notification of the death of the mortgagor." The letter noted that Mrs. Brush might have an interest in the property and recommended that she contact Wells Fargo's Assumption Department. (*Id*., Ex. 54). On October 28, 2010, Mrs. Brush faxed Wells Fargo a handwritten letter giving it permission to speak with her husband. (*Id*., Ex. 55).

On November 1, 2010, the day before the scheduled foreclosure sale, Mrs. Brush filed a state-court action against Wells Fargo and substitute trustees Rex Kessler, Thomas Reder, John Follis, and N. Sanchez, seeking to stop the foreclosure sale and a right to recover damages. (Docket Entry No. 1-3). Wells Fargo removed the suit to federal court on December 16, 2010, based on diversity jurisdiction. (Docket Entry No. 1 at 1). Kessler, Reder, Follis, and Sanchez have been dismissed from the suit. (Docket Entry Nos. 10, 28). Wells Fargo is the sole remaining defendant. Mr. Brush has been added as a plaintiff. (Docket Entry No. 12).

While this suit was pending, Wells Fargo sent Mrs. Brush an April 1, 2012 notice denying her request for a non-qualifying assumption because the mortgage was not current. The notice stated: "Due to recent changes in Wells Fargo's internal mortgage underwriting standards for loan assumptions, the loan you have applied to assume must be current during the processing of your application and at the time of any prospective assumption." (Docket Entry No. 37-4, Ex. 56).

In their first amended complaint, the Brushes alleged that Wells Fargo: breached both the October 2009 HAMP Loan Trial Period Agreement and the August 2010 Loan Modification Agreement; was negligent in its dealings with the Brushes; breached its duty of good faith and fair dealing to the Brushes by mismanaging the Agreements; violated both the Texas Debt Collection Act and the federal Fair Debt Collection Practices Act; and violated the Texas Deceptive Trade Practices Act. The Brushes seek declaratory and injunctive relief, damages, attorney's fees, and interest. (Docket Entry No. 22).

Wells Fargo moved for summary judgment on all of the Brushes' claims. At a hearing, this court heard argument, granted summary judgment on the Brushes' negligence and breach of the duty of good fair dealing claims, and took the Brushes' remaining claims under advisement. This opinion addresses Wells Fargo's summary judgment motion as to the Brushes' remaining claims and Wells Fargo's amended motion for judgment on the pleadings.

## II.     The Legal Standards

### A.      Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence

of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

### B.    Rule 12(c)

Wells Fargo has asked for leave to file its motion for judgment on the pleadings under Rule 12(c).  The Brushes challenge Wells Fargo's request on the basis that it was made after the pretrial motions deadline and is a "disguised attempt to reargue the issues upon which it did not prevail in its timely filed Motion for Summary Judgment." (Docket Entry No. 68, ¶ 5).  Federal Rule of Civil Procedure 16(b)(4) states that a court-ordered deadline may be modified for good cause and with the court's consent. FED. R. CIV. P. 16(b)(4).  Courts consider four factors in deciding whether there is good cause to amend a scheduling order: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice."  *Southwestern Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir. 2003).  A district court has "broad discretion to preserve the integrity and purpose of the pretrial order." *Hodges v. United States*, 597 F.2d 1014, 1018 (5th Cir. 1979).

Wells Fargo has shown good cause under Rule 16(b).  Wells Fargo's 12(c) motion will not delay trial and will clarify and help resolve the issues before the court.  The Brushes have not shown that they would be prejudiced by the modification to the scheduling order permitting the Rule 12(c) motion to be filed.  The Brushes have already filed their response to Wells Fargo's Rule 12(c) motion.

The Brushes' position that the motion reargues issues that this court already decided against Wells Fargo is not supported by the record.  The minute entry from the May 11, 2012 motion hearing states that the court "granted the motion for summary judgment on the

11

negligence and breach of the duty of good faith and fair dealing claims, as stated on the record" and "will issue an opinion addressing the motion for summary judgment on the breach of contract and statutory claims." (Docket Entry No. 42). Wells Fargo's motion for leave to file its Rule 12(c) motion is granted.

A Rule 12(c) motion "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (citation omitted). The standard of review under Rule 12(c) is the same as under Rule 12(b)(6). *Gentilello v. Rege*, 627 F.3d 540, 543–44 (5th Cir. 2010). A claim may be dismissed under Rule 12(b)(6) when the party fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The federal pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (internal quotation omitted).

When a pleading fails to state a claim, a district court generally should provide the party at least one chance to amend the pleading under Rule 15(a) before dismissing the claim with

prejudice.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). A party should be denied leave to amend if the court determines that "the proposed change . . . advances a claim or defense that is legally insufficient on its face." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990); *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) ("[A] district court acts within its discretion when dismissing a motion to amend that is . . . futile.").

## III.   Analysis

### A.   Breach of Contract

The Brushes allege that Wells Fargo twice agreed to modify Struble's original mortgage agreement.  They allege that Wells Fargo breached these modification agreements by attempting to foreclose on the property.  In Texas, a plaintiff claiming breach of contract must show: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.  *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (citing *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)).  Whether a party's conduct constitutes a breach is a question of law for the court to determine.  A triable issue on breach is present only if there is a genuine dispute material to determining whether a party performed the contract.  *E.P. Towne Ctr. Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 123–24 (Tex. App.—El Paso 2007, no pet.).

Wells Fargo seeks summary judgment and a judgment on the pleadings on the Brushes' breach of contract claims on the basis that the October 2009 HAMP Loan Trial Period Letter and the August 2010 Loan Modification Agreement are not valid contracts.  Well Fargo argues that

13

the Brushes cannot be parties to a loan modification agreement if they are not also parties to the underlying loan.   (Docket Entry Nos. 23, ¶¶ 27–28; 39, ¶¶ 1–6, 12, 15, 30–37).  Wells Fargo points out that, on both documents, "Ronald J. Struble" was listed as "Borrower" and "Wells Fargo Bank, N.A." was listed as "Lender," and that Mrs. Brush signed her own name as well as Struble's name.   (Docket Entry No. 23, at ¶ 14).  Wells Fargo also argues that, even if the August 2010 Loan Modification Agreement is a valid contract, the Brushes breached it when Mrs. Brush's first (and only) check for payment under the Agreement was declined for insufficient funds.  (Docket Entry No. 39, ¶ 46).

The Brushes respond that both the October 2009 and August 2010 loan documents are valid written agreements that were signed by the Brushes and accepted by Wells Fargo.  (Docket Entry No. 36, at 15).  The Brushes argue that because Wells Fargo knew about Struble's death, its decision to accept the Brushes' mortgage payments after receiving the October 2009 document and to sign the August 2010 document make both valid contracts.  (*Id.*, at 15–16).  The Brushes also argue that there is a genuine factual dispute as to whether Mrs. Brush lacked sufficient funds to cover her first payment under the August 2010 Agreement and whether Wells Fargo breached that Agreement first.

### 1. Whether the Brushes Had Authority to Modify Struble's Loan Agreement

An initial question as to the validity of the October 2009 and August 2010 Agreements is whether the Brushes had authority to modify the original loan documents.  Struble's Deed of Trust contains a "due-on-sale clause."  (Docket Entry 37-2, Ex. 2, § 18).  It states in part that: "[i]f all or any part of the Property or any Interest in the Property is sold or transferred . . . without Lender's prior written consent, Lender may require immediate payment in full of all

sums secured by this Security Instrument." (*Id.*).  Due-on-sale clauses are "intended to enable the mortgagee to decline to deal with a proposed new owner when the proposed new owner is not creditworthy or when the mortgage payments are not current." *In re Allen*, 300 B.R. 105, 119 (Bankr. D.D.C. 2003).  Due-on-sale clauses have become standard in mortgage agreements. The clauses typically require borrowers to obtain their lender's prior written consent before transferring any interest in a mortgage or mortgaged property.  If a borrower fails to get such consent, the lender may exercise its right to accelerate the note and foreclose on the property. (Docket Entry 37-2, Ex. 2, § 13 (stating that: "[s]ubject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. . . .")).

Federal law has created certain exceptions to the enforceability of due-on-sale clauses. During the early 1980s, some courts criticized these clauses as unreasonable restraints on trade. *See, e.g.*, *Wellenkamp v. Bank of Am.*, 582 P.2d 970 (Cal. 1978), *superseded by statute*, 12 U.S.C. § 1701j-3.  In response, Congress passed the Gann-St. Germain Depository Institutions Act, which generally prohibited state laws restricting due-on-sale clauses.  12 U.S.C. § 1701j-3; *see also Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) (holding that a pre-Gann-St. Germain Act federal regulation preempted a state law restricting the enforcement of due-on-sale clauses).  Congress also believed "that it would be unfair and inappropriate for lenders to enforce due-on-sale clauses under certain circumstances — such as involuntary transfers resulting from the death of a borrower . . . ."  S.Rep. No. 97–536, 97th Cong., 2d Sess. 20–21 (1982).  The Gann-St. Germain Act carved out narrow limits that apply when a loan is "secured by a lien on residential real property containing less than five dwelling units."  One of

these limits states that "a lender may not exercise its option pursuant to a due-on-sale clause upon . . . a transfer to a relative resulting from the death of a borrower." 12 U.S.C. § 1701j-3(d) & (d)(5); see also 12 C.F.R. § 591.5(b)(v) & (v)(A) (limiting enforcement of due-on-sale clauses when "the transferee is a person who occupies or will occupy the property" and when the "transfer [is] to a relative resulting from the death of the borrower); (Docket Entry 37-2, Ex. 2 at § 18 (creating a contractual exception to Struble's due-on-sale clause where its "exercise is prohibited by Applicable Law")).

The transfer of the home to Mrs. Brush after Struble's death falls into this federal-law exception. Under Texas law, Struble's interest in the Inverrary Property passed to Mrs. Brush when he died. See TEX. PROB. CODE § 37 ("[W]henever a person dies intestate, all of his estate shall vest immediately in his heirs at law[.]"). Mrs. Brush alleges in her complaint that she filed a Small Estate Affidavit on November 9, 2009, which the court approved in a November 13, 2009 order. (Docket Entry No. 22, ¶ 20). Mrs. Brush submitted a copy of both the Affidavit and the court order approving it in response to Wells Fargo's summary judgment motion. (Docket Entry No. 37-2, Ex. 25).

Wells Fargo challenges Mrs. Brush's authority to file a Small Estate Affidavit on the grounds that she was married and an adult when Struble died. (Docket Entry No. 64, ¶ 21).[1] The language of the Small Estate Affidavit statute, TEX. PROB. CODE § 137,[2] does not support Wells

---

[1]  Wells Fargo makes this challenge in its Rule 12(c) motions but not in its summary judgment motion. In considering this argument, the court looks only to the sufficiency of the allegations in the Brushes' amended complaint. See Wolcott, 635 F.3d at 763 (holding that, in considering a Rule 12(b)(6) motion, a court may only rely on "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). Unless otherwise noted, the parties' arguments on other issues are evaluated under the summary judgment standard.

[2]  Texas Probate Code § 137 states in relevant part:

(a) The distributees of the estate of a decedent who dies intestate shall be

Fargo's position.  Nor has Wells Fargo advised the court of any cases construing Texas law in a manner that prevents married adults from filing a Small Estate Affidavit when other statutory requirements are met.  Wells Fargo relies exclusively on secondary sources, but these sources do not support its interpretation of the law.  The sources that Wells Fargo cites include a Dallas County Probate Court webpage stating:

> A Small Estate Affidavit cannot transfer title to any real property unless (1) the property was the decedent s homestead and (2) *the*

---

> entitled thereto, to the extent that the assets, exclusive of homestead and exempt property, exceed the known liabilities of said estate, exclusive of liabilities secured by homestead and exempt property, without awaiting the appointment of a personal representative when:
>
> > (1) No petition for the appointment of a personal representative is pending or has been granted; and
> > (2) Thirty days have elapsed since the death of the decedent; and
> > (3) The value of the entire assets of the estate, not including homestead and exempt property, does not exceed $50,000; and
> > (4) There is filed with the clerk of the court having jurisdiction and venue an affidavit sworn to . . ., which affidavit shall be examined by the judge of the court having jurisdiction and venue; and
> > (5) The affidavit shows the existence of the foregoing conditions and includes a list of all of the known assets and liabilities of the estate, the names and addresses of the distributees, and the relevant family history facts concerning heirship that show the distributees' rights to receive the money or property of the estate or to have such evidences of money, property, or other rights of the estate as are found to exist transferred to them as heirs or assignees; and
> > (6) The judge, in the judge's discretion, finds that the affidavit conforms to the terms of this section and approves the affidavit; and
> > (7) A copy of the affidavit, certified to by said clerk, is furnished by the distributees of the estate to the person or persons owing money to the estate, having custody or possession of property of the estate, or acting as registrar, fiduciary or transfer agent of or for evidences of interest, indebtedness, property, or other right belonging to the estate.
>
> (b) This section does not affect the disposition of property under the terms of a will or other testamentary document nor, except as provided by Subsection (c) of this section, does it transfer title to real property.
> (c) Title to a decedent's homestead that is the only real property in a decedent's estate may be transferred on an affidavit that meets the requirements of this section. . . .

17

> *property will be inherited by an heir who was homesteading with the decedent at the date of decedent's death* (for example, a surviving spouse or an unmarried child of the decedent who resided on the property with decedent).

PROBATE COURTS OF DALLAS COUNTY, SMALL ESTATE AFFIDAVIT CHECKLIST, http://www.dallascounty.org/department/courts/probate/forms/SmallEstateAffidavitChecklist.pdf (emphasis added).  Mrs. Brush's allegations that she moved into Struble's home before his death, (Docket Entry No. 22, ¶ 8), would be sufficient even under the additional "homesteading with the decedent at the date of the decedent's death" requirement referred to in this webpage.

Wells Fargo's motion for judgment on the pleadings based on Mrs. Brush's asserted lack of authority over the home is denied.

Wells Fargo's motion is granted, however, as to Mr. Brush.  Under Texas's community property regime, "property acquired by the spouse during marriage by . . . descent" is considered separate property.  TEX. FAM. CODE § 3.001; *see also In re Marriage of Case*, 28 S.W.3d 154, 158 (Tex. App.—Texarkana 2000, no pet.).  Mr. Brush has not sufficiently pleaded that he had an ownership interest in the home when the Brushes alleged they entered into the loan modification agreements with Wells Fargo.

Mrs. Brush has shown that she had authority to assume Struble's mortgage debt.  Authority to assume the mortgage, however, is not actual assumption.  Under Texas law, a transferee "of property securing a mortgage is not obligated to pay the mortgage simply because title is acquired with knowledge or notice of its existence or because the purchaser agreed to take the encumbered property."  *Vaughn v. SecurityNational Mortg. Co.*, 2012 WL 3016859, at *3 (Tex. App.—Hous. [14th Dist.] July 24, 2012) (determining that purchaser of land that was already encumbered by two deeds of trust was not liable for deficiency amount because he did

18

not assume payment of the debt secured by those deeds of trust (citing *Slaughter v. Morris*, 291 S.W. 961, 962–63 (Tex. Civ. App.—Austin 1926, writ dism'd, w.o.j.)).  A transferee is protected from personal liability for a deficiency beyond the value of the mortgaged property.  *Id.* (citing *Kansas City Life Ins. Co. v. Hudson*, 71 S.W.2d 574, 576 (Tex. Civ. App.—Waco 1934, writ ref'd) ("[T]he implied agreement arising out of the acceptance of title to land subject to an indebtedness secured by lien thereon . . . can be enforced in this state only by subjecting such property to the satisfaction thereof, and does not create personal liability on the part of the purchaser."); *International–Great N.R. Co. v. Oehler*, 262 S.W. 785, 788 (Tex. Civ. App.—Texarkana 1924, writ ref'd) ("[W]here purchasers take property subject to a pre-existing lien, without a covenant assuming the mortgage debt, they are not personally liable in the sense that they may be held responsible for any deficiency beyond the value of the incumbered [sic] property in their hands.").[3]  This means that Mrs. Brush had several options.  She could: (1) let Wells Fargo foreclose on the Property; (2) make mortgage payments without assuming the underlying debt; or (3) assume the underlying debt based on the terms in the original mortgage documents.

"The purchaser of property subject to a mortgage may, by the use of particular language, evidence an intention to become personally liable for the mortgage debt."  *Vaughn v.*

---

[3]   The Gann-St. Germain Act is consistent with Texas law.  The Act was intended to protect involuntary transferees, a goal that would be defeated if transferees involuntarily assuming a mortgage were personally liable for deficiencies incurred by others.  That the mortgage on property inherited by a relative is assumable rather than automatically assumed is also consistent with federal regulations requiring a transferee to take affirmative steps to assume mortgage debt.  According to 12 C.F.R. § 591.5(c), the Act's limitations on the enforceability of due-on-sale clauses do "not prohibit a lender from requiring, *as a condition to an assumption*, continued maintenance of mortgage insurance by the existing borrower's successor in interest, whether by endorsement of the existing policy or by entrance into a new contract of insurance."  *Id.* (emphasis added).

*SecurityNational Mortg. Co.*, 2012 WL 3016859, at *3 (citing *Fid. Union Fire Ins. Co. v. Cain*, 28 S.W.2d 833, 836 (Tex. Civ. App.—Dallas 1930, no writ.)). This language need not be in the form of an Assumption Agreement in order to be effective. For instance, "[a] deed may contain a clause that the land is purchased subject to the lien indebtedness, [or] by the use of other language in the deed may evidence an intention on the part of the purchaser to become personally liable for such indebtedness." *Cain*, 28 S.W.2d at 836; *see also Vaughn*, 2012 WL 3016859, at *3. The August 2010 Agreement that Mrs. Brush signed stated: "I agree to pay in full the Deferred Principal Balance and any other amounts still owed under the Note and Security Interest . . . ." (Docket Entry No. 37-3, Ex. 39, § 3). If Mrs. Brush is able to prove that the August 2010 Agreement was a valid contract with Wells Fargo to modify Struble's loan, then she will also be able to show that she legally assumed Struble's loan.

### 2. Whether the October 2009 Loan Trial Period Letter Was an Enforceable Loan Modification Agreement

In Texas, a valid contract requires: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; (5) execution and delivery of the contract with the intent that it be mutual and binding; and (6) consideration. *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 670 (Tex. App.—Ft. Worth 2010, no pet.). The question is whether, as a matter of law, the October 2009 letter was not a valid contract.

The October 2009 Letter was not a valid loan modification contract between Mrs. Brush and Wells Fargo. The transmittal letter, addressed to Ronald Struble, invited him to participate in the HAMP Trial Period Program, and stated: "[t]his Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's

signature." (*Id.*).  The only copy in the record is signed by Mrs. Brush but not by Wells Fargo. (Docket Entry No. 37-2, Ex. 23).  The Brushes do not allege that they received a copy of the letter signed by Wells Fargo.  In *Pennington v. HSBC Bank USA, N.A.*, 2012 WL 451333 (5th Cir. 2012), the Fifth Circuit considered the absence of the lender's signature dispositive, holding that if the bank does not sign and return the TPP document, it does "not form a contract, because the bank never expressed an intent to be bound."  *Id.* at *4; *see also Soin v. Fed. Nat'l Mortg. Ass'n.*, 2012 WL 1232324, at *5 (E.D. Cal. Apr. 12, 2012) (holding invalid a similar HAMP TPP document that lacked the lender's signature).  The Fifth Circuit also held that the lender's intent not to create a contract was clear because "the bank did not send [the plaintiffs] a contract saying they were approved to move on to Step Two."  *Pennington*, 2012 WL 451333, at *4.  Similarly, the Brushes received the Step One document, but nothing in the record indicates that Wells Fargo sent them the Step Two document.  The Brushes have failed to raise a factual dispute material to whether the "October 2009 Agreement" is a valid contract.  Wells Fargo has shown that, as a matter of law, the October 2009 letter is not an enforceable contract to modify the loan. Summary judgment is granted in favor of Wells Fargo on the Brushes' claim for breach of contract based on the October 2009 Letter.

### 3.    Whether the August 2010 Loan Modification Agreement Was a Valid Contract

What the Brushes call the "August 2010 Agreement" is based on the July 19, 2010 offer from Wells Fargo to Ronald Struble inviting Struble to participate in an alternate loan modification program designed for "homeowners like you who did not meet all eligibility requirements under the Home Affordable Modification Program."  (Docket Entry No. 37-2, Ex. 39).  The top of the Agreement states:

> This Loan Modification Agreement ("Agreement"), made as of 09/01/2010 between: RONALD J. STRUBLE *("Borrower")* and Wells Fargo Bank, N.A. *("Lender")*, amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed . . . and (2) the adjustable rate/fixed rate note . . . which covered the real and personal property described [in] the Security Instrument and defined therein as the "Property", located at 14818 INVERRARY DR, HOUSTON TX - 77095."

*Id.* (emphasis in original).  The bottom of the signed Agreement appears as follows:

| Wells Fargo Bank, N.A. | /s/ *Ronald J. Struble (Kristina L. Brush)* |
|---|---|
| Lender | |
| Halimo Y. Adem | *08/14/2010* |
| VP of Loan Documentation | Date |
| | |
| By: /s/ *Halimo Adem* | |
| | |
| 08/17/10 | |
| Date | Date |

Wells Fargo and the Brushes dispute whether Mrs. Brush's signature at the end of the August 2010 Agreement creates a genuine fact dispute material to determining whether that Agreement is an enforceable contract between Mrs. Brush and Wells Fargo.  The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument.  *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994).  Only if a contract is first determined to be ambiguous may a court consider the parties' subjective interpretation, *see Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981), and admit extraneous evidence to determine the meaning of the instrument, *see R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).  If a written contract can be given a definite or certain legal meaning, then it is not ambiguous.  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *see also Universal C.I.T. Credit Corp. v. Daniel*,

243 S.W.2d 154, 157 (Tex. 1951).   If a contract is subject to two or more reasonable interpretations, it is ambiguous.  *See Glover v. National Insurance Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977); *see also Coker*, 650 S.W.2d at 393; *Universal*, 243 S.W.2d at 157.  Parol evidence is not admissible to create an ambiguity.  *See Universal*, 243 S.W.2d at 157; *Lewis v. East Texas Finance Co.*, 146 S.W.2d 977, 980 (1941).  Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered.  *See Coker*, 650 S.W.2d at 394; *R & P Enterprises*, 596 S.W.2d at 518.

To resolve state-law issues, federal courts ordinarily look to the decisions of the relevant state's highest court.  *See Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009).  If there are no controlling decisions by the highest state court, federal courts must make an "*Erie* guess" as to what the controlling state law would be.  "In making an *Erie* guess, [federal courts] defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise, and [they] may consult a variety of sources, including the general rule on the issue, decisions from other jurisdictions, and general policy concerns."  *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 483 (5th Cir. 2008).  Mrs. Brush signed the August 2010 Agreement despite its designation of Struble and Wells Fargo as the contracting parties.  The parties did not cite, and this court did not find, a Texas case addressing similar facts.  This court looks to relevant decisions by courts in other jurisdictions.

The majority courts in other states that have considered similar issues have held that a mismatch between a signatory and a person named in the instrument may give rise to an ambiguity that justifies the use of extrinsic evidence.  For example, in *Caplan v. Stant*, 154

S.E.2d 121 (1967), the Virginia Supreme Court considered whether individual defendants whose names are signed at the end of a lease but who are not named in the instrument may be obligated under it.  Finding that "it must be assumed that these individual defendants signed the instrument and affixed their seals thereto for some purpose," the court held that parol evidence was admissible.  *Id*. at 124.  The court further explained that "such evidence which relates to the formation or existence of a contract between the parties is not in violation of the parol evidence rule":

> The parol evidence rule prohibits the introduction of extrinsic evidence to vary the terms of a written instrument.  It does not exclude evidence as to whether a valid contract has been made or entered into between the parties . . . .  Nor does it prohibit the showing of the true relation of the parties to the contract, which is among the questions here involved.

*Id*.

The Wisconsin Supreme Court reached a similar conclusion in *St. Regis Apt. Corp. v. Sweitzer*, 145 N.W.2d 711 (Wis. 1966).  The court considered a contract in which a wife's signature was located directly beneath her husband's name in a space designated "lessee," but the body of the contract mentioned only her husband's name.  The court explained that "[t]his at least creates an ambiguity about whetehr [sic] she was a party to the contract," and it held that the trier of fact was permitted to consider parol evidence.  *Id*. at 715, *abrogating Nutrena Mills v. Earle*, 111 N.W.2d 491 (Wis. 1961).[4]

---

[4]   Several other state appellate courts have also permitted the trier of fact to consider extrinsic evidence in circumstances similar to those surrounding the August 2010 Agreement.  *See Gonzales v. Gauna*, 206 P. 511, 513 (N. Mex. 1922) (holding that a son could be bound by a contract that he signed even though his father's name and not his appeared in the body); *Schuster v. Snawder*, 101 S.W. 1194 (Ky. 1907) ("[I]f signatories do not clearly disclose their connection with the instrument, it seems to us that every reason for receiving outside evidence to show what the parties intended in any ambiguous contract applies with equal cogency for the reception of such evidence to show in what capacity the parties who signed the document intended to do so."); *Woodock v. Udell*, 97 A.2d 878, 881 (Del. Super. Ct. 1953) (holding that parol evidence is admissible to show that an individual who signed a contract but is not named in the body is a party to the

The reasoning of these cases is consistent with how Texas courts evaluate contracts when a contracting party's capacity is unclear from the contract.  In *Lassiter v. Rotogravue Comm., Inc.*, 727 S.W.2d 8 (Tex. App.—Dallas 1986, writ ref'd n.r.e.), for instance, an intermediate appellate court held that "if the instrument is ambiguous . . . so that it is uncertain whether it is intended to bind the principal or agent, parol evidence of the circumstances attending its execution is admissible to show the real understanding."  *Id*. at 9 (citing *Byrd v. Southwest Multi-Copy, Inc*., 693 S.W.2d 704, 706 (Tex. App.—Houston [14th Dist.] 1985, no writ).  Permitting parol evidence is also supported by general contract interpretation principles.  In order to interpret a contact consistently with the parties' intent, courts seek "to harmonize and to give effect to all the provisions of the contract so that none will be rendered meaningless."  *Universal*

---

contract); *Fed'l Sign System v. Berger*, 149 N.Y.S. 936, 937 (N.Y. App. Term. 1914) (holding that when a contract names the parties, a signature by a defendant not named "creates an ambiguity, and parol testimony . . . [should be] admitted to explain the capacity in which the defendant signed."); *Electric Carriage Call & Specialty Co. v. Herman*, 123 N.Y.S. 231, 233 (N.Y. App. Term. 1910) ("A person who is not named in the body of an instrument and signs his name thereto before delivery, is to be held liable as a party to the contract. This is considered to be an application of the rule which requires effect to be given to all parts of a written instrument." (citation omitted)); *Esselstyn v. McDonald*, 90 N.Y.S. 518, 520 (N.Y. App. Term. 1904) ("[D]oubt or ambiguity on the face of the instrument, as to the capacity in which the third signer intended to bind himself, may be resolve by the aid of explanatory parol evidence."); *Cf. Strange v. McCall*, 166 S.E. 33 (Ga. Ct. App. 1932) ("Where the signature of a person appears upon a contract, and, from the location of the signature and its nature and the nature of the recitals in the contract, it cannot be determined, without a resort to extrinsic evidence, that the person in affixing the signature did so with the intention of becoming a party to the contract, the contract, *in the absence of such extrinsic evidence*, will not be construed as a contract executed by the person whose signature thus appears affixed thereto." (emphasis added)).

However, courts in Alabama and a few other jurisdictions have declined to permit parol evidence to clarify the purpose of an unexplained signature on a contract.  *Mersereau v. Whitesburg Center, Inc.*, 251 So.2d 765, 770 (Ala. Civ. App. 1971) ("'[W]here an instrument in writing purports on its face to be made by certain parties named therein, and the signature of a party not named therein appears to the instrument, it is not the deed or contract of said last-named party, and parol testimony is not admissible to show that he intended to bind himself thereby,'" (quoting *Brown v. O'Byrne*, 45 So. 129, 129 (Ala. 1907))); *Blackmer v. Davis*, 128 Mass. 538, 542 (Mass. 1880) (holding that where a contract's body shows consideration between two parties, a court may not consider parol evidence to determine whether a third party's signature binds him); *Lancaster v. Roberts*, 144 Ill. 213, 222–23 (Ill. 1893) ("[W]hen a third person merely annexes his name to a contract which in the body of it does not mention him, and which is in itself a complete contract between other parties who sign it and are mentioned in it, such third person does not thereby become a party to the efficient and operative parts of the contract.").

*C.I.T. Credit Corp.*, 243 S.W.2d at 157.  Some effect must be given to Mrs. Brush's signature to avoid make it surplusage.  Because the parties' intent is unclear from the face of the contract, using extrinsic evidence to clarify that intent is appropriate.

There is considerable evidence in the record supporting the Brushes' allegations that Wells Fargo was aware of Struble's death.  The Brushes sent Wells Fargo several handwritten notes beginning in 2009 stating that Struble had died and that they intended to make loan payments.  The Brushes sent Wells Fargo the death certificate and the Small Estate Affidavit and court order approving the Affidavit to show that Mrs. Brush had inherited the property.  Wells Fargo spoke to the Brushes by telephone regarding the loan on multiple occasions.  Wells Fargo requested the Brushes' financial information.  The October 2009 HAMP TPP document that Wells Fargo received included the Brushes' signatures.  Mrs. Brush made several loan payments in her own name.  Wells Fargo's internal records include an entry stating "MORTGAGER DECEASED."  Wells Fargo ordered a title search that showed Struble had died.  The record also reflects that Wells Fargo signed the August 2010 Loan Modification Agreement after Mrs. Brush signed.  When Hamilo Y. Adem, Wells Fargo's Vice-President of Loan Documentation, executed the Agreement, Mrs. Brush had already signed her name in the neighboring signature line on the same page.  *See G–W–L, Inc. v. Robichaux*, 643 S.W.2d 392, 393 (Tex. 1982), *overruled on other grounds*, *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 355 (Tex. 1987) ("Contracting parties are obligated to protect themselves by reading what they sign and are presumed, as a matter of law, to know the contract's terms."); *Amer. Employers' Ins. Co. v. Aiken*, 942 S.W.2d 156, 161 (Tex. App.—Fort Worth 1997, no writ)).

In its Rule 12(c) motion, Wells Fargo also argues that the August 2010 Agreement is not a valid loan modification contract because it lacks consideration.  In the August 2010

Agreement, Mrs. Brush agreed to assume and become personally liable for Struble's loan obligation.  This is sufficient consideration to make the August 2010 Agreement a valid contract.  *See In re Marriage of Scott*, 2012 WL 5507448, at *3 (Tex. App.—Texarkana Nov. 14, 2012, no pet. h.) ("It is well established that, in general, the assumption of a debt can be sufficient consideration." (citing *Wisdom v. Smith*, 209 S.W.2d 164, 168 (Tex. 1948) and *Shenandoah Assocs. v. J & K Props., Inc.*, 741 S.W.2d 470, 499 (Tex. App. —Dallas 1987, writ denied))).

### 4.       Whether Mrs. Brush Breached the Loan Modification Agreement

Wells Fargo argues that, even if there was a valid loan modification contract, Mrs. Brush breached that contract by failing to timely make her first payment.  (Docket Entry No. 39, ¶ 6).  Wells Fargo has introduced evidence showing that it attempted to deposit Mrs. Brush's August 2010 check but that the check was rejected by Mrs. Brush's bank for insufficient funds.  (Docket Entry No. 39-5, Ex. A-4).   The Brushes respond that Wells Fargo repudiated the loan modification agreement and refused to deposit their loan payment check.  (Docket Entry No. 36, at 25).

The undisputed record evidence shows that Wells Fargo attempted to deposit the Brushes' check, and that the Brushes' bank refused to honor it due to insufficient funds.  Wells Fargo has introduced into the record a copy of Mrs. Brush's check marked "NSF."  (Docket Entry No. 39-5, Ex. A-4).  A statement from the Brushes' joint bank account shows that the Brushes were charged on August 18, 2010 a "Returned Item Fee For An Unpaid Check # 1095 IN The Amount of $1,616.72."  (Docket Entry No. 37-4, Ex. 58).  This is the same amount as Mrs. Brush's monthly payment under the loan modification agreement.  Mrs. Brush's equivocal and conclusory affidavit statements that she does "not know why" the check was returned and "believe[s] that there were sufficient funds in my bank account" do not create an issue of fact.

27

(Docket Entry No. 36-2, ¶ 30).  Nor do the Brushes point to any evidence suggesting that Wells Fargo rejected the August 2010 Agreement before the Brushes' check was returned for insufficient funds.  The Fifth Circuit has held that "unsubstantiated assertions are not competent summary judgment evidence."  *Reynolds v. New Orleans City*, 272 F. App'x 331, 338 (5th Cir. 2008) (citations omitted).  "In response to motions for summary judgment, it is incumbent upon the non-moving party to present evidence — not just conjecture and speculation — to support each element of the claim."  *Id.*  The Brushes have failed to show that there is a genuine dispute of fact material to whether the Brushes breached the August 2010 Loan Modification Agreement.

### 5.    Whether Wells Fargo Gave Mrs. Brush a Right to Cure the Default

Mrs. Brush's breach is not necessarily fatal to her contract claim.  The original deed of trust provides the mortgagee with a right to cure any default and requires the mortgage holder to provide a written notice informing the mortgagee of that right:

> Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . . .  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. . . .

(Docket Entry No. 37-2, Ex. 2, § 22).  The Note similarly provides:

> If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest

that I owe on that amount.  That date must be at least 30 days after
the date on which the notice is mailed to me or delivered by other
means.

(Docket Entry No. 37-2, Ex. 1, § 6(C)).  The August 2010 Loan Modification Agreement that

Mrs. Brush signed expressly incorporates the right to cure provision.  The August 2010

Agreement states: "All the rights and remedies, stipulations, and conditions contained in the

Security Instrument relating to default in the making of payments under the Security Instrument

shall also apply to default in the making of the modified payment hereunder."  (Docket Entry

No. 37-3, Ex. 35, § 7(a)).  Wells Fargo has not provided the court with a copy of a default or

cure notice and has not pointed to or submitted any other evidence showing that it satisfied its

obligation under the Note to provide Mrs. Brush with an opportunity to cure her default before it

initiated the foreclosure process.

Because there is a material dispute of fact as to whether Wells Fargo complied with the

loan agreement's cure provision, summary judgment is denied as to Mrs. Brush's breach of

contract claim.[5]

### B.    Promissory Estoppel

As an alternative to their breach of contract claims, the Brushes assert that Wells Fargo is

liable for damages under a promissory estoppel theory.  The elements of promissory estoppel in

Texas are: (1) a promise; (2) foreseeability of reliance thereon by the promisor; and (3)

---

[5]  In its motion for judgment on the pleadings, Wells Fargo argues that, even if the court finds that
the August 2010 Agreement is a valid contract, the Brushes have failed to show that they were damaged by
Wells Fargo's breach because the Brushes' indebtedness exceeds the Property's value.  (Docket Entry No.
64, ¶¶ 29–32).  In support of its argument, Wells Fargo requests that the court take judicial notice of the Small
Estate Affidavit, which includes an estimate of the Property's value.  As evidence of Mrs. Brush's loan
indebtedness, Wells Fargo relies on an affidavit attached as an exhibit to its summary judgment motion.  This
affidavit estimate falls outside the range of materials that a court may consider in a Rule 12(c) motion.  Wells
Fargo's motion for judgment on the pleadings is denied as to its argument that the Brushes' have failed to
show damages for Wells Fargo's breach of the loan modification contract.

substantial reliance by the promisee to her detriment. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983). Promissory estoppel is a cause of action available to a promisee who has acted to her detriment in reasonable reliance on an otherwise unenforceable promise. *Bell v. Bank of Am. Home Loan Servicing LP*, 2012 WL 568755, at *5 (S.D. Tex. Feb. 21, 2012). Promissory estoppel is an alternative to a breach of contract claim. *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). "Promissory estoppel does not create a contract where none existed before, but only prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them." *Ford v. City State Bank of Palacios*, 44 S.W.3d 121, 139 (Tex. App.—Corpus Christi 2001, no pet.).

The Brushes allege that, beginning in November 2009, they made six mortgage payments to Wells Fargo in the belief that Wells Fargo would modify the loan agreement. (Docket Entry No. 22, & 48). The Brushes also allege that they made payments to Wells Fargo under the purported August 2010 loan modification agreement. (*Id.*, ¶ 49). They argue that they justifiably relied on Wells Fargo's acceptance of payments that Wells Fargo knew were not from Struble. (*Id.*, ¶ 50).

Wells Fargo responds that the Brushes' promissory estoppel claims are precluded by the statute of frauds. When the statute of frauds applies, promissory estoppel is available only if the alleged oral promise is a promise to sign an existing document that satisfies the statute of frauds. *Bank of Tex., N.A. v. Gaubert*, 286 S.W.3d 546, 553 (Tex. App.—Dallas 2009, pet. dism'd); *see also Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 549 (5th Cir. 2010) ("Under Texas law, promissory estoppel requires that the agreement that is the subject of the promise must comply with the statute of frauds. That is, the agreement must be in writing at the time of the oral promise to sign it." (internal quotation omitted)).

30

The Brushes argue that Wells Fargo has waived any affirmative defense based on the statute of frauds by failing to plead it in its answer.  Federal Rule of Civil Procedure 8(c) requires that affirmative defenses be included in the initial responsive pleading.  FED. R. CIV. P. 8(c).  A party that fails to follow Rule 8(c) may waive any omitted affirmative offense.  5 CHARLES ALAN WRIGHT & ARTHUR P. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL  § 1278.  "Where the matter is raised in the trial court in a manner that does not result in unfair surprise, however, technical failure to comply precisely with Rule 8(c) is not fatal."  *Allied Chem. Corp. v. Mackay*, 695 F.2d 854, 855–56 (5th Cir. 1983).  A defense is not waived if raised at a "pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond."  *Rogers v. McDorman*, 521 F.3d 381, 385–86 (5th Cir. 2008) (quotation marks and citation omitted).  The Brushes have not shown that they were prejudiced by Wells Fargo's failure to plead the statute of frauds as an affirmative defense.  Because Wells Fargo raised the statute of frauds defense in its motion for summary judgment, the Brushes had an adequate opportunity to respond in its opposition to summary judgment.

In opposing summary judgment, the Brushes argue that, in August 2009, "Wells Fargo induced [them] into making payments to Wells Fargo by promising them that Wells Fargo would restructure the debt that was secured against Mrs. Brush's house."  (Docket Entry No. 36, at 21).  The records reflect that the Brushes made six monthly payments to Wells Fargo around this time.  (Docket Entry No. 37-4, Ex. 57).  Under the statute of frauds, however, any modification to Struble's original loan agreement was required to be in writing.  *See, e.g.*, *Deuley v. Chase Home Finance LLC*, 2006 WL 1155230, at *2 (S.D. Tex. Apr. 25, 2006) ("The oral modification in this case relates to the original loan agreement, which must be in writing because it exceeds $50,000.  Thus, the modification is also required to be in writing to comply with the statute of

frauds." (citing § 26.02(a)(2))).

To avoid the statute of frauds, the Brushes might claim that Wells Fargo did not simply make an oral promise to modify the loan, but also stated that it would sign a written loan modification agreement.  The only written agreement that the Brushes discuss is the October 2009 HAMP Trial Period Program application.  The HAMP TPP is the first step towards obtaining a loan modification under HAMP, but it is not, itself, a loan modification.  The HAMP TPP application makes a permanent loan modification conditional on a number of factors, including an applicant's ability to qualify under the program.  *Pennington*, 2012 WL 4513333, at *3.  The Brushes have not identified or provided any evidence showing that they met the necessary conditions for a loan modification under HAMP.  *Cf. Ford v. City State Bank*, 44 S.W.3d 121, 139–40 (Tex. App.—Corpus Christi 2001, no pet.) (requiring party to establish it met conditions of an offer in order to raise question of fact on application of promissory estoppel doctrine).  The Brushes have not shown that the payments under the HAMP TPP were in reliance on a promise to modify the original loan agreement.  Their claim under the HAMP TPP does not survive summary judgment.

The Brushes' promissory estoppel claim relating to the August 2010 Loan Modification Agreement also fails as a matter of law.  The Brushes have not shown that they relied on the Agreement to their detriment.  *Cf. Wheeler v. White*, 398 S.W.2d 93, 97 (Tex. 1965) ("[W]here the promisee has acted in reliance upon a promise to his detriment, the promisee is to be allowed to recover no more than reliance damages measured by the detriment sustained. . . . [I]t is reasonable to conclude that all that is required to achieve justice is to put the promisee in the position he would have been in had he not acted in reliance upon the promise.").  The only payment that the Brushes made under the Agreement was returned by their bank for insufficient

funds.  In their summary judgment response, the Brushes do not point to or submit any other evidence showing that they made other payments since the check bounced or otherwise relied on Wells Fargo's statement that it would enter into the August 2010 Agreement.  The Brushes have failed to show that there is a genuine issue of fact material to their promissory estoppel claims.

### C.    The TDCA Claims

The Brushes allege that Wells Fargo violated the Texas Debt Collection Act in five ways: it threatened that not paying the loan would lead to seizure of the property without proper court proceedings, TEX FIN. CODE § 392.301(a)(7); it threatened to take actions prohibited by law, § 392.301(a)(8); it made fraudulent, deceptive, or misleading representations, § 392.304; it misrepresented the amount due under the Note, § 392.304(a)(8); and it misrepresented the debt's status in a judicial proceeding, § 392.304(a)(8).  Wells Fargo moves for summary judgment. Each ground, and the response, is analyzed below.

### 1.    Whether the Brushes Are Consumers Under the TDCA

Wells Fargo first argues that the Brushes' TDCA claims fail as a matter of law because the Brushes cannot prove that they are "consumers" under the statute.  (Docket Entry No. 23, ¶ 31–40).  Wells Fargo's argument assumes that plaintiffs suing under the TDCA must qualify as "consumers."  The TDCA defines a "consumer" as "an individual who has a consumer debt." TEX. FIN. CODE § 392.001(1).  A "consumer debt" is "an obligation, or an alleged obligation, primarily for personal, family, or household purposes and arising from a transaction or alleged transaction." § 392.001(2).  A "debt collection" means "an action, conduct, or practice in collecting, or in soliciting for collection, consumer debts that are due or alleged to be due to a

creditor." § 392.001(5).[6]  A "debt collector" refers to "a person who directly or indirectly engages in debt collection and includes a person who sells or offers to sell forms represented to be a collective system, device, or scheme intended to be used to collect consumer debts." § 392.001(6).  Wells Fargo argues that the Brushes are not "individual[s] who [have] a consumer debt" because neither is "the Borrower on the property, and neither [has] entered into a Deed of Trust with Wells Fargo regarding the Property."  (Docket Entry No. 23, ¶ 33).

Mrs. Brush is a consumer under the TDCA.  As explained above, Mrs. Brush assumed Struble's debt when she entered into a loan modification agreement with Wells Fargo.  The record does not show that Mr. Brush inherited the home.  He did not assume the debt under the August 2010 Loan Modification Agreement.  Because he does not have a consumer debt, the Brushes have not provided any evidence suggesting that Mr. Brush is a "consumer" under the TDCA.

## 2.    Whether a Non-Consumer May Sue Under the TDCA

Although the Texas Supreme Court has not addressed this issue, there is support for finding that, in some circumstances, non-consumers like Mr. Brush may have standing and a statutory right to sue under the TDCA.  First, the TDCA's civil remedies provision is not limited

---

[6]  The Texas Supreme Court has yet to address whether foreclosure is "debt collection" under the TDCA.  Other courts applying Texas law have permitted foreclosure-related claims under the TDCA.  *See, e.g.*, *Watson v. Citimortgage, Inc.*, 814 F. Supp. 2d 726, 734–35 (E.D. Tex. 2011) (holding that foreclosure is "debt collection" under the TDCA and allowing the plaintiffs' claim that the mortgagor's representations surrounding the foreclosure were fraudulent, deceptive, or misleading); *Akintunji v. Chase Home Fin., L.L.C.*, 2011 WL 2470709, at *3 (S.D. Tex. June 20, 2011) ("Unlike the FDCPA, the TDCA encompasses foreclosure activities by mortgage holders."); *Rey v. Acosta*, 860 S.W.2d 654, 659 (Tex. App.—El Paso 1993, no writ) ("Wrongful acceleration of a real estate note, as occurred here, violates the Texas Debt Collection Practices Act and the Deceptive Trade Practices Act as a matter of law.") (citing *Dixon v. Brooks*, 604 S.W.2d 330, 334 (Tex. Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.)).  In *Biggers v. BAC Home Loans Servicing, LP*, 767 F. Supp. 2d 725 (N.D. Tex. 2011), the district court made an "*Erie* guess" and concluded that the TDCA can apply to actions taken in foreclosing on real property.  *Id.* at 732; *see also Woods v. Bank of Am., N.A.*, 2012 WL 1344343 (N.D. Tex. Apr. 17, 2012) (same).

to "consumers."  Section 392.403 states that a "person" may sue for injunctive relief and actual damages in response to TDCA violations.  TEX. FIN. CODE § 392.403.  Second, courts have found or assumed, in at least two decisions, that nonconsumers can sue under the TDCA.

In *Campbell v. Beneficial Finance Co. of Dallas*, 616 S.W.2d 373, 375 (Tex. App.—Texarkana 1981, no writ), an intermediate Texas appellate court held that certain nondebtors may assert TDCA claims that arise out of the "debtor/creditor relationship."  The plaintiff sued a bank for making repeated harassing telephone calls to her in an attempt to get her to disclose contact information for her daughter and son-in-law, who had borrowed from the bank.  The court noted that, "while the threat, coercion, harassment or abuse must occur in connection with the collection or attempted collection of a debt allegedly owed by a consumer, persons other than the debtor may maintain an action for violations of the Act."  *Id*. at 375.  The court held that "[a]ny person against whom the prohibited acts are committed may maintain an action for actual damages sustained as a result of those violations."[7]  *Id*.  The nondebtor plaintiff could sue the bank for the harassing phone calls because "[t]he alleged abuses were committed directly against her."  *Id*.

In another case, *Prophet v. Myers*, 2009 WL 1437799, at *5 (S.D. Tex. May 21, 2009), a debtor's father sued a debt collector after the father found a demand letter addressed to his estranged son.  In considering whether the plaintiff had standing, the federal court cited

---

[7] Federal courts have adopted a similar approach to suits by non-debtors under the FDCPA.  *See, e.g.*, *Johnson v. Bullhead Investments, LLC*, 2010 WL 118274, at *6–7 (M.D.N.C. Jan. 11, 2010); *Garrett v. Empire Cooler Service, Inc.*, 2004 WL 838032, at *2 (N.D. Ill. Apr.16, 2004) (non-debtor had standing to sue where debt collection practices were directed towards his property); *Thomas v. Consumer Adjustment Co., Inc.*, 579 F. Supp. 2d 1290, 1298 (E.D. Mo. 2008); *King v. Trott and Trott P. C.*, 2008 WL 2063555, at *5 (E.D. Mich. Mar. 28, 2008); *Burdett v. Harrah's Kansas Casino Corp.*, 294 F. Supp. 2d 1215, 1227 (D. Kan. 2003); Conboy v. AT & T Corp., 84 F. Supp. 2d 492, 504 n. 9 (S.D.N.Y. 2000); *Dewey v. Associated Collectors Inc.*, 927 F. Supp. 1172, 1174 (W.D. Wis. 1996); *West v. Costen*, 558 F. Supp. 564, 584 (W.D. Va. 1983).

*Campbell* but distinguished it on the facts, noting that the debt collector in *Campbell* directed the harassment against the debtor's mother rather than the debtor. *Id.* By contrast, in *Prophet*, "the letter could only reasonably be interpreted to be directed to Plaintiff's son, as it was mailed to Plaintiff's son's address and pertained to a debt incurred by Plaintiff's son." *Id.* at *2. The court held that the plaintiff lacked standing under the TDCA because he failed to show that "any of the alleged abuses were directed against him." *Id.* at *5.

The *Campbell* and *Prophet* decisions support an individualized approach to issues of standing and the right to under the TDCA. In reviewing the record to determine if the Brushes' TDCA claims survive summary judgment on the merits, this court also analyzes, where appropriate, whether Mr. Brush has standing to sue given the allegations in the complaint, the statutory language of each applicable TDCA provision, and the record evidence.

### 3.      Whether the Brushes Have Claims Under § 392.301(a)(7)

Section 392.301(a)(7) prohibits debt collectors from "threatening that nonpayment of a consumer debt will result in the seizure, repossession, or sale of the person's property without proper court proceedings." TEX. FIN. CODE § 392.301(a)(7). The Brushes allege that Wells Fargo violated this provision by threatening "to foreclose on the Property without taking the proper steps under Texas foreclosure law." (Docket Entry No. 22, ¶ 67(a)).

The Brushes have not shown that they have claims under § 392.301(a)(7). The undisputed record evidence shows that Wells Fargo intended to use a non-judicial foreclosure process according to express powers granted in the Deed of Trust. *See* TEX. PROP. CODE § 51.002 (sale of real property under contract lien). (Docket Entry No. 37-3, Ex. 41). The TDCA also states that § 392.301(a) does not prevent a debt collector from "exercising or threatening to exercise a statutory or contractual right of seizure, repossession, or sale that does not require

court proceedings." TEX FIN. CODE § 392.301(b)(3).  Wells Fargo's notice that it intended to use the nonjudicial eviction procedure permitted under Texas law is not actionable under the TDCA. And § 392.301(a)(7) only permits a person to sue for threatening that nonpayment of a consumer debt will result in the sale of "the person's property."  Mr. Brush has not provided or pointed to any evidence that Wells Fargo threatened to sell his property.  Summary judgment is granted against the Brushes on their § 392.301(a)(7) claims.

### 4.    Whether the Brushes Have Claims Under § 392.301(a)(8)

Section 392.301(a)(8) prohibits debt collectors from "threatening to take an action prohibited by law."  TEX. FIN. CODE § 392.301(a)(8).  The Brushes allege that Wells Fargo violated this provision by failing to send them written notices of default or acceleration before starting the foreclosure process.  (Docket Entry No. 22 at ¶ 67(a),(b)).

"To effect a valid foreclosure, the holder of a defaulted note must give notice of intent to accelerate with demand for payment and time to cure, notice of acceleration and notice of foreclosure sale at least 21 days before the sale and notice of default at least twenty days before notice of sale."  *Clark v. FDIC*, 849 F. Supp. 2d 736, 2011 WL 2709062, at *4 (S.D. Tex. 2011) (citing TEX. PROP. CODE § 51.002(b) and *Ogden v. Gibraltar Sav. Ass'n*, 640 S.W.2d 232, 233 (Tex. 1982)).  Notice to the debtor is satisfied so long as the notice is deposited for delivery to the debtor's last known address by certified mail.  TEX. PROP. CODE  § 51.002(e); *Hill v. Fremont Inv. & Loan*, 2004 WL 1178607, at *3 (Tex. App.—Dallas May 28, 2004, no pet.) (citing *Onwuteaka v. Cohen*, 848 S.W.2d 889, 882 (Tex. App.—Houston [1st Dist.] 1993, writ denied)).  The affidavit of a person who has knowledge that service was completed is prima facie evidence of service.  TEX. PROP. CODE § 51.002(e).  As explained above, the Note and Deed of Trust between Struble and Wells Fargo require notice of default and a 30-day cure period.

(Docket Entry No. 37-2, Ex. 1, § 6(C)).  These contractual requirements apply to Mrs. Brush through the August 2010 Loan Modification Agreement.  (Docket Entry No. 37-3, Ex. 39, § 7(a)).

The failure to send a legally-mandated notice can be the basis of a § 392.301(a)(8) claim. *See Gatling v. Citimortgage*, 2012 WL 3756581, at *10 (S.D. Tex. Aug. 28, 2012).  The Texas Supreme Court has stated that one of the main purposes of "[t]he statutory notice provisions of section 51.002" is to "protect the debtor by affording him a lengthy notice period in which he may cure[.]"  *Jasper Fed. Sav. & Loan Ass'n v. Reddell*, 730 S.W.2d 672, 674 (1987). Strict compliance is required with the Texas Property Code's nonjudicial foreclosure notice requirements.  *See, e.g.*, *Hill v. Wells Fargo Bank, N.A.*, 2012 WL 2065377, at *7 (S.D. Tex. June 6, 2012); *McIntosh v. U.S. Bank Nat'l Ass'n*, 2012 WL 75141, at *2 (S.D. Tex. Jan. 10, 2012) (citing *Univ. Sav. Ass'n v. Springwoods Shopping Ctr.*, 644 S.W.2d 705, 706 (Tex. 1982)); *Marsh v. Wells Fargo Bank, N.A.*, 760 F. Supp. 2d 701, 708 (N.D. Tex. 2011); *G4 Trust v. Consolidated Gasoline, Inc.*, 2011 WL 3835656, at *3 (Tex. App.—Fort Worth Aug. 31, 2011, pet. denied) (citing cases); *UMLIC VP LLC v. T & M Sales & Envtl. Sys., Inc.*, 176 S.W.3d 595, 609 (Tex. App.—Corpus Christi 2005, pet. denied).

The Texas Supreme Court has recently reaffirmed "that minor defects in an otherwise valid foreclosure sale do not void it."  *Kourosh Hemyari v. Stephens*, 355 S.W.3d 623, 628 (2011) (per curiam).  Such minor defects include the deed of trust's omission of a partnership designation, *id.*; the notice of default stating the incorrect amount of principal and interest, *Powell v. Stacy*, 117 S.W.3d 70, 75 (Tex. App.—Fort Worth 2003, no pet.); or the notice of foreclosure sale failing to state a specific time on the date that the sale was to occur, *Sanders v. Shelton*, 970 S.W.2d 721, 726 (Tex. App.—Austin 1998, pet denied.).  Failing to send the

38

required notices is, however, not the type of minor noncompliance that the case law overlooks.

Wells Fargo has not provided the court with an affidavit from an individual with personal knowledge or any other admissible evidence that the Brushes were served with the legally required notices. On summary judgment, the initial burden falls on the movant to identify the absence of a genuine dispute over the material facts underlying a claim. *Cf. Montgomery v. Wells Fargo Bank, N.A.*, 459 F. App'x 424, 428 (5th Cir. 2012) (holding that Wells Fargo met its initial burden by attaching a default notice to its motion).[8] Wells Fargo has not met its summary-judgment burden as to Mrs. Brush's § 392.301(a)(8) claim.

In light of the case law and the TDCA's broad civil remedies provision, Mr. Brush also may have a legally protected interest under § 392.301(a)(8). Mr. Brush has shown that his TDCA claim arises out of the "debtor/creditor relationship" between Wells Fargo and his wife. Mr. Brush has also provided evidence showing that the "alleged abuses were committed directly against" him. *Campbell*, 616 S.W.2d at 375. Section 392.301(a)(8)'s prohibition on "threatening to take an action prohibited by law" can be broken down into two elements: (1) a threat and (2) an action prohibited by law. The alleged legally prohibited action is Wells Fargo's failure to send Mrs. Brush notices required under Texas law before initiating the foreclosure process. As the mortgage debtor, Mrs. Brush may be the only party with standing to challenge the mortgagee's failure to comply with notice requirements. The TDCA, however, allows claims by those who receive *threats* of legal violations, regardless of whether the threatened actions are

---

[8] The Brushes (but not Wells Fargo) point to two default letters that were sent in February and March 2008. (Docket Entry No. 36-2, Exs. 3, 4). The August 2009 loan modification agreement that Wells entered into with Mrs. Brush modified the original promissory note and cured the prior default. As a result, Wells Fargo was required to send the Brushes new notices after Mrs. Brush defaulted anew under the loan modification agreement. *See Gatling*, 2012 WL 3756581, at *11 (holding that a mortgagee is required to send new legal notices if a debtor who had previously defaulted on a note defaults again after entering into a loan modification agreement).

39

directed at a debtor, the recipient of the threat, or another person.

To prove injury and causation under the TDCA, Mr. Brush must initially show that Wells Fargo directly communicated to him that it intended to foreclose on Mrs. Brush's home. The Brushes state that they discovered that Wells Fargo intended to foreclose on the home when they received an advertisement from a law firm offering to assist them in stopping the foreclosure process. (Docket Entry Nos. 36-2, ¶ 32, 36-3, ¶ 26). The record indicates that Mrs. Brush contacted Wells Fargo to clarify whether it intended to foreclose on the home and that she gave Wells Fargo permission to communicate directly with Mr. Brush. (Docket Entry No. 36-2, ¶ 43). Because Mr. Brush has shown that there is a genuine dispute of fact material to determining his standing to assert this TDCA claim and the merits of that claim, summary judgment is denied as to Mr. Brush's § 392.301(a)(8) claim.[9]

### 5.     Whether the Brushes Have Claims Under § 392.304(a)(8)

Section 392.304 of the TDCA prohibits a debt collector from using "in debt collection" certain practices that involve "fraudulent, deceptive, or misleading representations." TEX. FIN.

---

[9]   The Brushes allege that as a result of Wells Fargo's TDCA violations, they have suffered "damages, including economic damages and lost wages," (Docket Entry No. 22, ¶ 68), and have "suffered extreme emotional distress and mental anguish." (Docket Entry No. 22, ¶ 68). If Mr. Brush is able to show that Wells Fargo violated § 392.304(a)(8) by directing a threat to him, at minimum, he may be entitled to injunctive relief and statutory damages. An issue remains, however, as to whether any injuries that Mr. Brush suffered are traceable to the alleged threats that Wells Fargo communicated to him. Because the parties have not briefed this issue, the court declines to express an opinion as to whether Wells Fargo may be liable to Mr. Brush for actual damages under the TDCA.

Whether Mr. Brush has shown damages is not relevant to the standing issue. Plaintiffs suing under the TDCA may request injunctive relief and need not prove that they have suffered actual damages in order to have standing and a right to sue. *See Marauder Corp. v. Beall*, 301 S.W.3d 817, 822 (Tex. App.—Dallas 2009, no pet.) (describing the availability of actual and statutory damages and injunctive relief under the TDCA); *cf. Beaudry v. TeleCheck Services, Inc.*, 579 F.3d 702, 706 (6th Cir. 2009) (noting that the availability of statutory damages under the analogous FDCPA means that "a consumer may recover statutory damages if the debt collector violates the FDCPA even if the consumer suffered no actual damages" (citing *Fed. Home Loan Mortgage Corp. v. Lamar*, 503 F.3d 504, 513 (6th Cir. 2007))). As the Supreme Court has noted: "an invasion of a legally protected interest is an injury in fact." *Lujan*, 504 U.S. at 560.

Code § 392.304(a).   The Brushes allege that Wells Fargo violated § 392.304(a)(8) by "misrepresenting the character, extent, or amount of a consumer debt" and "misrepresenting the consumer debt's status in a judicial or government proceeding."

For a statement to be a misrepresentation under the TDCA, a defendant must have made a false or misleading assertion.   *Reynolds v. Sw. Bell Tel., L.P.*, 2006 WL 1791606, at *7 (Tex. App.—Fort Worth June 29, 2006, pet. denied).   A collection notice or balance statement misstating the amount owed on a debt constitutes a misleading assertion regarding the amount of that debt under the TDCA.   *See Baker v. Countrywide Home Loans, Inc.*, 2009 WL 1810336, at *7 (N.D. Tex. June 24, 2009); *see also Steele v. Green Tree Servicing, LLC*, 2010 WL 3565415, at *5, n. 6 (N.D. Tex. Sept. 7, 2010).

The Brushes argue that Wells Fargo misrepresented the character, extent, and amount of the consumer debt by "misrepresenting the amounts that were due and overdue on the Note." (Docket Entry No. 10, ¶ 68(d)).   The Brushes allege that Wells Fargo improperly charged the loan account a $30 NSF fee and falsely stated that Mrs. Brush's August 2010 loan payment check bounced when it was "rejected by Wells Fargo because Wells Fargo repudiated the August 2010 Agreement after it had deposited the check for payment."   (Docket Entry No. 36, at 28).

As discussed above, Wells Fargo has pointed to evidence showing that it attempted to deposit Mrs. Brush's August 2010 check but that the check was returned by Mrs. Brush's bank for insufficient funds.   (Docket Entry Nos. 37-4, Ex. 58; 39-5, Ex. A-4).   The Brushes do not point to any competent evidence controverting Wells Fargo's statement that it attempted to deposit the check.   Even if Mrs. Brush's bank account statement shows that she had enough money in her account to cover her payment to Wells Fargo, this is evidence only of an error by Mrs. Brush's bank, not a misstatement by Wells Fargo.   Moreover, the bank statement supports

41

Wells Fargo's claims that it attempted to deposit the August 2010 check.  The statement includes a notation that Mrs. Brush was charged an "insufficient funds fee."  (Docket Entry No. 37-4, Ex. 58).  Summary judgment is granted on the Brushes' claims under the TDCA that Wells Fargo misrepresented the character, extent, or amount of a consumer debt.

The Brushes also claim that Wells Fargo violated § 392.304(a)(8)'s prohibition on "misrepresenting the consumer debt's status in a judicial or government proceeding."  The Brushes allege that Wells Fargo misrepresented "that the mortgage loan was delinquent and that it was properly set for foreclosure."  (Docket Entry No. 10, ¶ 68(e)).

A nonjudicial foreclosure is not a judicial or government proceeding.  Although Texas law requires that a public sale in a nonjudicial foreclosure be performed at a courthouse, TEX. PROP. CODE § 51.002(a), the "proceeding" is performed by a private party, typically an attorney who serves as a "substitute trustee."  Even if a sale in a nonjudicial foreclosure were considered a government proceeding, the Brushes prevented the sale from taking place as scheduled by filing this lawsuit.  Summary judgment is granted on the Brushes' TDCA claims that Wells Fargo misrepresented the debt's status in a judicial or government proceeding.

The Brushes also attempt to state a claim directly under § 392.304(a) of the TDCA.  *See* TEX. FIN. CODE  § 392.304(a) ("Except as otherwise provided by this section, in debt collection or obtaining information concerning a consumer, a debt collector may not use a fraudulent, deceptive, or misleading representation that employs the following practices: . . . .").  Section 392.304(a) does not create a cause of action independently of the nineteen practices listed within the statutory provision.  Summary judgment is granted as to the Brushes' § 392.304(a) claims.

**D.     DTPA Claim**

The Brushes allege that the same facts that allegedly give rise to TDCA claims are also actionable under the Texas Deceptive Trade Practices Act (DTPA).  (Docket Entry No. 22, ¶¶ 72–77).  There are three elements to a DTPA claim: "(1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages."  *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (citing TEX. BUS. & COM. CODE § 17.50(a)(1)).  The Brushes rely on a tie-in provision, which makes a violation of certain other laws, including the TDCA, a deceptive act under the DTPA.  TEX. FIN. CODE § 392.404(a).  The Brushes argue that because they are "consumers" under the TDCA, they must also be "consumers" under the DTPA.  (Docket Entry No. 36, at 27).

Wells Fargo responds that the Brushes lack standing to assert DTPA claims because they do not qualify as consumers as that term is defined under the DTPA.  (Docket Entry No. 23, ¶ 41).  To be a "consumer" under the DTPA, a person "must seek or acquire goods or services by lease or purchase" and "the goods or services sought or acquired must form the basis of [that person's] complaint."  *Fix v. Flagstar Bank, FSB*, 242 S.W.3d 147, 159 (Tex. App.—Fort Worth 2007, pet. denied).  "If either requirement is lacking, the party must look to the common law or some other statutory provision for redress."  *Id.*

Although the DTPA's text distinguishes the type of damages that plaintiffs bringing claims through "tie-in" statutes may recover, it does not exempt those claimants from proving consumer status.  *Cushman v. GC Services, L.P.*, 397 F. App'x. 24, 28 (5th Cir. 2010).  Because the definitions of "consumer" under the TDCA and DTPA are different, individuals who are consumers under one may not be under the other.  *Compare* TEX. BUS. & COM. CODE § 17.45(4) ("'Consumer' means an individual . . . who seeks or acquires by purchase or lease, any goods or

43

services . . . ."), *with* TEX. FIN. CODE § 392.001(1), (2) ("'Consumer' means an individual who has . . . an obligation, or an alleged obligation, primarily for personal, family, or household purposes and arising from a transaction or alleged transaction.").

In this case, there are no allegations or evidence that the plaintiffs sought to acquire or acquired, by lease or purchase, goods or services that form the basis of their DTPA claim. The Brushes sought a loan modification from the defendants.  Their DTPA claim arises solely from their efforts to modify Struble's mortgage loan and prevent foreclosure.  "Generally, a person cannot qualify as a consumer if the underlying transaction is a pure loan because money is considered neither a good nor a service."  *Id.* at 160.  Courts have held that "subsequent actions related to mortgage accounts — for example, extensions of further credit or modifications of the original loan — do not satisfy the 'good or services' element of the DTPA."  *Broyles v. Chase Home Fin.*, 2011 WL 1428904, at *4 (N.D. Tex. Apr. 13, 2011).  Because the plaintiffs sought to modify their mortgage loan and not to acquire, by purchase or lease, a "good" or "service," they do not have a viable DTPA claim.  *See, e.g.*, *Montalvo v. Bank of Am. Corp.*, 2012 WL 1078093, at *7–11 (W.D. Tex. Mar. 30, 2012) (holding that a person seeking a mortgage-loan modification was not a consumer under the DTPA); *Cavil v. Trendmaker Homes, Inc.*, 2010 WL 5464238, at *4 (S.D. Tex. Dec. 29, 2010) (holding that "a mortgage or modification of a mortgage is not a good or a service under the DTPA").  Summary judgment is granted as to the Brushes' DTPA claims.

### E.       FDCPA Claim

The FDCPA seeks to eliminate "abusive, deceptive, and unfair debt collection practices" by regulating the type and number of contacts a "debt collector" can have with a debtor.  15 U.S.C. § 1692.  "Consumers may sue to enforce the Act's provisions and, if successful, recover

actual damages, statutory damages, and attorney's fees and costs." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 500 (5th Cir. 2008) (citing 15 U.S.C. § 1692k). The Brushes allege that Wells Fargo violated the FDCPA by using unfair, false, and deceptive collection methods, 15 U.S.C. § 1692e(2); giving a false impression of the character and amount of the debt, §§ 1692f, 1692e(5); and attempting to collect amounts not permitted by law, § 1692f(1).

The law is clear that "mortgage lenders are not 'debt collectors' within the meaning of the FDCPA." *Montgomery v. Wells Fargo Bank, N.A.*, 459 F. App'x 424, 428 n. 1 (5th Cir. 2012) (citing *Williams v. Countrywide Home Loans, Inc.*, 504 F.Supp.2d 176, 190 (S.D. Tex. 2007), *aff'd*, 269 F. App'x 523 (5th Cir. 2008)); *see also Nwoke v. Countrywide Home Loans, Inc.*, 251 F. App'x 363, 364–65 (7th Cir. 2007) ("The FDCPA protects debtors from improper practices of 'debt collectors' — third parties who attempt to recoup debts owed to creditors. But a creditor who collects its own debt using its own name is not a 'debt collector.'" (internal citations omitted)). The undisputed facts show that Wells Fargo is a mortgage lender attempting to collect its own debt.[10] Wells Fargo is entitled to summary judgment on the Brushes' FDCPA claims.

## IV.     Conclusion

For the reasons stated above, Wells Fargo's motion for summary judgment, (Docket Entry No. 23), is:

---

[10] *Compare* 15 U.S.C. § 1692a(6) (defining "debt collector" under the FDCPA as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."), *with* TEX. FIN. CODE § 392.001(5), (6) (defining "debt collector" under the TDCA as "a person who directly or indirectly engages in" an "action, conduct, or practice in collecting, or in soliciting for collection, consumer debts that are due or alleged to be due to a creditor.").

- GRANTED as to the Brushes' contract claims under the October 2009 HAMP Letter and Mr. Brush's claim under the August 2010 Agreement and DENIED as to Mrs. Brush's claim under the August 2010 Agreement;

- GRANTED as to the Brushes' promissory estoppel claims;

- GRANTED as to the Brushes' claims under the TDCA §§ 392.301(a)(7), 392.304, (a)(8) and DENIED as to the Brushes' claims under the TDCA § 392.301(a)(8);

- GRANTED as to the Brushes' claims under the DTPA; and

- GRANTED as to the Brushes' claims under the FDCPA.

Wells Fargo's motion for leave to file a motion for judgment on the pleadings, (Docket Entry No. 65), is granted.  Wells Fargo's motion for judgment on the pleadings under Rule 12(c), (Docket Entry No. 64), is moot to the extent that Wells Fargo repeats arguments disposed of on summary judgment and otherwise denied.  Wells Fargo's motion for leave to file a motion for judgment on the pleadings, (Docket Entry No. 54), is moot.  Wells Fargo's motion for judgment on the pleadings under Rule 12(c), (Docket Entry No. 55), is moot.

SIGNED on November 29, 2012, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge